UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ROSANNE D. SCANDURA,

                Plaintiff,

      -against-

MICHAEL J. ASTRUE
COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.
------------------------------------------------------------X

**MEMORANDUM & ORDER**

07 cv 5098 (RJD)

DEARIE, Chief Judge.

      Pursuant to 42 U.S.C. § 405(g), Rosanne Scandura appeals the Commissioner of Social Security's final decision, denying her benefits under the Social Security Act ("SSA") for alleged disabilities essentially amounting to chronic pain caused by, inter alia, degenerative disc and joint disease in her spine and knees. Ms. Scandura is a high school graduate, born April 23, 1947, who worked for over fifteen years as a legal and general secretary. In her own words, plaintiff cannot work because she is "racked with pain throughout [her] body . . . ." (Tr. 324.) However, the Commissioner ultimately denied Scandura's application for Social Security Disability ("SSD") benefits, finding that plaintiff was not disabled prior to December 31, 2004, the date she last met the insured status earnings requirements set out in Title II of the SSA.[1] The parties move for judgment on the pleadings. Upon careful review of the record, the Court remands the matter for further proceedings consistent with the following discussion.

---

[1] See 42 U.S.C. § 423(a)(1)(A) and (C); 20 C.F.R. §§ 404.101, 404.120 and 404.315(a). The date that an applicant last met the insured status requirements is referred to as the date last insured, or the DLI. Plaintiff's DLI of December 31, 2004 is not in dispute. She must therefore establish the onset of disability prior to this date.

## BACKGROUND

### I. Procedural History

Plaintiff originally filed for SSD benefits on May 1, 2004. Her claim was denied and plaintiff timely requested a hearing. Represented by Jacques Farhi of Binder and Binder, Scandura appeared before ALJ Hazel C. Strauss for a hearing held on May 19, 2005. Both plaintiff and Melissa Collins, a vocational expert, testified at the initial hearing. During the hearing, plaintiff also amended her initial onset date from January 1, 1999 to November 1, 1999. (See Tr. 316.) In a decision dated June 20, 2005, the ALJ denied plaintiff's claim, concluding that Ms. Scandura not disabled.

Plaintiff appealed to the Appeals Council and by Order dated December 28, 2005, the Council remanded the matter for further consideration of the treating source opinion from Dr. Ja Gu Kang and for evaluation of the claimant's subjective complaints. (See Tr. 297.) The Appeals Council also suggested that ALJ Strauss contact Dr. Kang concerning the discrepancy between a pre-DLI opinion and his more recent medical source statement. (Id.) ALJ Strauss contacted Dr. Kang and conducted a supplemental hearing on March 27, 2007. In a decision dated May 22, 2007, ALJ Strauss again found that plaintiff was not disabled at any time prior to her DLI. (See Tr. 12-19.) The Appeals Council denied plaintiff's request for review of this decision on October 22, 2007, constituting the Commissioner's final decision.

### II. Medical Evidence

*A.  Dr. Donald Keith, plaintiff's chiropractor*

Dr. Donald Keith treated plaintiff from May 11, 1998 through September 20, 2000 (Tr. 136-142). In a questionnaire dated July 27, 2004, Dr. Keith indicated that at the time of

treatment he diagnosed Scandura with lumbar facet syndrome, lumbar intervertebral disintegration, sciatica and cervicobrachial syndrome. Dr. Keith also reported that x-rays and MRI results showed spinal and foraminal stenosis as well as scoliosis. These findings, according to Dr. Keith's report, indicated that plaintiff was limited to 2 hours of standing and less than 6 hours of sitting in an 8-hour work day. He stated that plaintiff's condition posed no limitation to her ability to push and/or pull, and indicated that her ability to carry was limited, but did not specify a particular limit to the amount of weight carried. Dr. Keith stated that he could not provide a medical opinion concerning Ms. Scandura's current ability to work because he had not seen her since September 2000.

### B. Dr. Kang, plaintiff's internist

Ms. Scandura began treatment with her internist, Dr. Ja Gu Kang, in 1977. In a Multiple Impairments Questionnaire completed by Dr. Kang on July 26, 2004, he indicated that he saw Ms. Scandura twice a year, most recently on April 26, 2004 (Tr. 156-167).[2] He diagnosed plaintiff with sciatic radiculopathy, arthritis of the hip and hypertension (Tr. 156). Dr. Kang stated on the Questionnaire that clinical findings and plaintiff's symptoms indicated "low back pain radiating to [the] legs," left elbow and right foot and ankle (Tr. 156-57). He cited the results of an MRI in support of his diagnosis. Dr. Kang also indicated on the Impairments Questionnaire that Scandura experienced a pain level of 8 on a scale of 10, and could sit and stand for up to only one hour per day (Tr. 158). After a period of sitting, plaintiff could not sit again for a period of 30-60 minutes before returning to a seated position. Dr. Kang also stated

---

[2]Dr. Kang provided his treatment notes, located in the administrative record at pages 164-167, however, the notes are all but illegible and Dr. Kang was never asked to clarify their specific contents.

3

that plaintiff needed to get up and move around every few minutes and could occasionally lift and carry up to 5-10 pounds (Tr. 159), but he did not indicate a problem with repetitive reaching, handling, fingering or lifting (Id.) Plaintiff's ability to reach, including overhead, is described as "moderate," defined as "significantly limited but not completely precluded" (Tr. 160). Dr. Kang characterized Scandura as a patient in frequent pain, pain that will last at least twelve months. He indicated that she was incapable of even a "low stress" job. According to Dr. Kang, she would need to miss work more than three times a month, and her ability is limited to push, pull, kneel, bend and stoop on a sustained basis, as may be required in the normal course of a workday. He states that the described symptoms and limitations were present since 1998 (Tr.162).

In the course of diagnosis and treatment, Dr. Kang also referred Scandura to several specialists, including an orthopedic surgeon, Dr. Mehran Manouel, a rheumologist, Dr. Katherine Sullivan, and a neurologist, Dr. Paul Lerner. Scandura also underwent physical therapy in November 2000 at Eversharp Physical Therapy on the advice of Dr. Kang (Tr. 116, 171-75). In a letter dated November 15, 2005, Dr. Kang concluded that plaintiff was "permanently totally disabled" based in part on the findings of her orthopedist, Dr. Nour (see below).

Dr. Kang submitted another Multiple Impairment Questionnaire on November 15, 2005 (post-DLI), giving the date of his most recent exam as November 10, 2005, and stating that he was treating Scandura once every two to three months (Tr. 223-230). At this point, approximately a year and a half after his previous Impairment Questionnaire, Dr. Kang set her pain level at a 10 on a 10-point scale, stated that she could not lift 5 pounds, that she needed to get up every 15 minutes when sitting due to her pain, and that she had to wait 10 minutes before

sitting again (Tr. 225). Dr. Kang also found that Scandura experienced severe limitation in performing repetitive operations such as reaching, handling, fingering or lifting, due to neck pain (Tr. 226). He stated that she would be "essentially precluded" during a competitive 8-hour workday from a wide range of upper body activities. Again Dr. Kang concluded that her symptoms existed since 1998, and that she would need to miss work more than three times per month due to impairments or treatment (Tr. 229). In general, then, the November 2005 Questionnaire describes the same symptoms that were present in July 2004, only now more acutely manifest and limiting to the plaintiff's ability to perform normal work. According to Dr. Kang, she had moved from and 8 to a 10 on the pain scale, and the pain she experienced was "constant" rather than "frequent" (Tr. 225, 228).

Following the Appeals Council remand, ALJ Strauss, as directed by the Council, asked Dr. Kang to explain his November 2005 findings (Tr. 18, 246). Dr. Kang briefly responded to each question in the ALJ's letter, attaching the orthopedist, Dr. Nour's, report (see below) and the results of a more recent, post-DLI MRI. When asked to state his reasons for limiting Scandura's sitting and standing/walking to no more than one hour per day, Dr. Kang responded "she walks with a cane, stress esp. on weight-bearing areas precipitates pain" (Tr. 246). When asked why in his estimation her condition had worsened since his July 2004 assessment, Dr. Kang stated "re-evaluated by orthopedic surgeon Dr. Nour, see attached reports" (Tr. 246-47).

    C.    *Dr. Mehran Manouel, plaintiff's orthopedist*

Dr. Kang referred plaintiff to orthopedist Dr. Manouel, who evaluated her on May 3, 2004. Physical examination revealed pain on palpation and decreased range of motion in the lumbar spine. Her straight leg test was positive bilaterally. Dr. Manouel ordered an new MRI

(the previous MRI was from 1998), the results of which evidenced lumbar degenerative joint disease with disc herniation (Tr. 110). According the MRI report, dated May 7, 2004, "the prior disc herniations described on report of exam from June 12, 1998 are less conspicuous on the current exam" (Tr. 114). The report did show degenerative joint and disc disease, resulting in mild-to-moderate spinal stenosis (Tr. 113). Scandura returned to Dr. Manouel twice for follow-up, on May 18, 2004, and on July 2, 2004, each time complaining of lower back pain. Dr. Manouel prescribed Celebrex, noting on each visit pain on palpation and decreased range of motion. She tested negative in a straight leg test on May 18, 2004, and positive on her July 2, 2004 straight leg test.

### D. *Dr. Paul Lerner, plaintiff's neurologist*

On August 16, 2004, again on Dr. Kang's referral, Dr. Lerner evaluated plaintiff (Tr. 212-16). Dr. Lerner ultimately concluded that plaintiff's pain may be due to joint disease, rather than a neurological problem (Tr. 213). He recommended consulting a rheumatologist. He also recommended further laboratory testing, including imaging of the cervical spine and right knee (Id.). Dr. Lerner noted a mild degree of restricted movement in the neck, pain to percussion over the spine and to palpation over the paravertebral muscles. He did not observe swelling, redness or warmth in her joints. Motor testing revealed strength in the lower extremities was limited by pain, but muscle bulk, tone and motor power was otherwise normal in the upper extremities (Tr. 215). Plaintiff returned for a follow-up visit on August 31, 2004. Laboratory tests ordered after her last visit were unremarkable, but Dr. Lerner noted that no test for Lyme disease was performed. The impression was "lumbar strain with disc herniation and symptoms of radiculitis despite negative EMG/NCV testing" (Tr. 193). Dr. Lerner referred plaintiff to a pain

management consultant.

> E. *Dr. Kyung Seo, SSA Consultative Examiner, and Dr. Montorfano, SSA Medical Consultant*

Dr. Seo examined Scandura on August 31, 2004, at the recommendation of the New York State Office of Temporary and Disability Assistance (Tr. 168, 176-77). Dr. Seo, an orthopedist, found plaintiff used a non-weight bearing cane, and had no difficulty getting on and off the examination table. His impressions after physical examination indicate: "(1) Internal derangement of both knees with degenerative osteoarthritis of both knees. (2) Lower back derangement. (3) Degenerative spondylosis, probably spondylolisthesis as described on the MRI report." (Tr. 177.) Dr. Seo's prognosis was "guarded." He stated that, due to "rigid spine with spondylolisthesis," and "degenerative osteoarthritis of both knees," plaintiff's sitting was "slightly limited," standing and walking was "moderately limited" and bending, lifting and carrying heavy objects were "severely limited." (Id.)

Dr. Montorfano apparently reviewed Dr. Seo's assessments, both before and after Dr. Seo ordered knee x-rays (Tr. 179, 182). In the "Advice" portion of the first Electronic Request for Medical Advice form, dated October 4, 2004, Dr. Montorfano states:

> The 'musculoskeletal' CEMD [Dr. Seo] reported a ROM of the spine, after which he stated: 'Rigid spine'. I'd have no idea what he meant by that, since we have no evidence this claimant has a truly 'rigid spine' or an inflammatory arthropathy, such as AS, Reiters, etc. He did describe LOM of the knees, which neither the cl's orthopedist, nor the P.T. or the Internist had mentioned. Since there is no clear evidence the back impairment meets or has met listings, or would limit the claimant to less than sedentary activities (and there is no current ME from Dr. Manouel– see my R/C with his office) I'd suggest supplemental x rays of both knees.

(Tr. 177.) After reviewing the x-ray results of plaintiff's knees, on October 22, 2004, Dr.

7

Montorfano concluded:

> Result of x rays noted. Claimant has some DJD [degenerative joint disease] (mild) in her knees. Again, it is interesting that, with the LOM reported by CEMD, there has been no indication she complained about her knees to the Orthopedist. With the ME we have, I'd suggest a current RFC for L/C: 20 lbs; Walk/stand: 2 out of 8 hs. Sit: 6 out of 8 hs. with appropriate changes in position. No climbing/balancing. Occ stooping/kneeling/ crouching. No crawling. No gross limitation in the use of her hands.

(Tr. 182.)

Dr. Montorfano's findings are summarized on a Physical Residual Functional Capacity Assessment form that was completed by Sharlene Smalls (Tr. 183-188). The form states, under the heading "Symptoms":

> The claimant's allegations were considered when completing her functional assessment. She describes being able to walk between 10 & 20 minutes before resting, resting 10-15 minutes before continuing. In view of medical evidence stated in A6 her statements are credible but not to the degree alleged.

(Tr. 186.) The form also indicates that no treating or examining source in the file conflicts with the conclusions of Drs. Seo and Montorfano (Tr. 187). There is no way of knowing from the administrative record, however, which medical records were available in the State file.

  *F.* *Dr. Girish Sonopal, consultative rheumatologist*

On May 26, 2005, after plaintiff's DLI and on referral from Dr. Kang, plaintiff visited Dr. Sonopal (Tr. 253-54). Dr. Sonopal, a rheumatologist, examined plaintiff and reviewed her MRI report. In Dr. Sonopal's opinion, Scandura appeared to be a candidate for laminectomy, and she suffered from spinal stenosis with bilateral lumbar radiculopathy and osteoarthritis of the right knee (Tr. 254).

  *G.* *Dr. Mohamed Nour, orthopedist*

Dr. Nour examined Ms. Scandura on June 16, 2005, approximately 6 months after her

DLI and at the request of her attorney (Tr. 198-210). After performing a physical exam and reviewing reports from Dr. Manouel (pre-DLI) and plaintiff's MRI results from 1998 and 2004, Dr. Nour diagnosed plaintiff with chronic cervical sprain/strain, chronic lumbar strain/sprain and internal derangement of both knees (Tr. 202-03). He concluded that plaintiff was "permanently totally disabled" (Tr. 201), a finding that Dr. Kang repeated in his subsequent November 15, 2005 Multiple Impairment Questionnaire.

Dr. Nour also completed a Questionnaire, dated June 15, 2005 (Tr. 203-210). Dr. Nour opined that Ms. Scandura could sit/stand/walk for less that one hour in an 8-hour workday, should never lift any weight for work purposes and could only sit for 15 minutes at a time (Tr. 205-06). Dr. Nour's Questionnaire also advanced the retrospective finding that plaintiff had been suffering from the symptoms and limitations described since 1998 (Tr. 209).

### H. Dr. Catherine Sullivan, plaintiff's rheumatologist

On referral from Dr. Kang, plaintiff was examined by Dr. Sullivan in June, July, August and October 2005 (post-DLI) (Tr. 218-220, 263-64, 272-79). Dr. Sullivan diagnosed plaintiff with lumbar spinal stenosis, right knee pain and osteoarthritis. A blood test performed in April 2005 showed a rheumatoid arthritis factor of 7 and a negative ANA screen (Tr. 241). In a November 6, 2005 letter, almost a year after the DLI, Dr. Sullivan described the difficulties that Ms. Scandura faced in performing everyday activities in light of her condition (Tr. 245). Dr. Sullivan also completed an Arthritis Impairment Questionnaire, dated November 7, 2005 (Tr. 272-279). Dr. Sullivan's findings largely repeat previous conclusions, including diagnosis with lumbar spinal stenosis, osteoarthritis, and knee pain. Dr. Sullivan found a far more restricted RFC than did Drs. Seo and Montorfano, for example, stating that Scandura could lift up to five

9

pounds only, and that "[i]t is not recommended that [Ms. Scandura] be in a competitive 5/day work environment due to the significant difficulty [she] has in the limited ability to handle her activities of daily living due to her musculoskeletal condition." (Tr. 275.)

## III. Non-Medical Evidence

The ALJ held a hearing on May 19, 2005,[3] where both the plaintiff and a vocational expert, Melissa Collins, testified (Tr. 314-54). The ALJ examined the plaintiff concerning her level of daily activity, pressing Ms. Scandura to qualify what she could and could not do on her own. In response to the ALJ's request for a description of a typical day, plaintiff stated the following: "I lay down a lot, actually . . . I try to alternate from sitting. I try throughout to get up and stand a little bit. But ultimately, I end up laying down most of the time, and one doctor along the way suggested that I lay down as much as possible. So, that's what I do with a pillow between my knees. I watch TV; I read. I talk on the phone. I, I don't do much." (Tr. 333.) Plaintiff stated that she was living with a family (not her own), but had previously lived alone. She described the onset of her disability, in November 1999, stating "I just started having pain" (Tr. 336-37). She stated that she stopped working because she was laid off (Tr. 324). She identified the sciatica as the greatest source of pain (Tr. 331). Plaintiff does not drive and requires a cane to walk (Tr. 322, 324). She can't take public transportation, can't sit or stand for very long (Tr. 324). She does not have trouble bathing, dressing and grooming herself (Tr. 338). Her son and only child provides support in the form of odd errands and housework (Tr. 333-35).

---

[3]ALJ Strauss conducted a supplemental hearing on March 27, 2007, following the Appeals Council remand for further consideration of the treating source opinion from Dr. Ja Gu Kang and for evaluation of the claimant's subjective complaints (Tr. 307-12). However, while the ALJ received new medical reports into evidence, no new non-medical testimony was offered at the supplemental hearing (Tr. 310, 312).

She goes shopping with her landlady, who does most of the lifting (Tr. 341). Plaintiff testified that she has been to church twice with her landlady and that she doesn't otherwise have a social life (Tr. 336). In response to questions probing her RFC, plaintiff stated that she could not lift a 10 pound object, indeed, she claimed she could not lift anything heavier than a milk container (Tr. 341).

Vocational Expert Melissa Collins also testified at the May 19, 2005, hearing. The ALJ crafted a hypothetical using Dr. Seo's RFC report, asking Ms. Collins whether an individual with such limitations would be able to work as a secretary. Ms. Collins stated that such an individual could perform secretarial work, which is plaintiff's past relevant work (Tr. 346-47). When posed with variations on the hypothetical, Ms. Collins ultimately stated that an individual who needed to alternate frequently between seated and standing position would not be fit to work as a secretary, which is largely a sedentary job (Tr. 347-48.) In response to a question by Ms. Scandura's attorney, Ms. Collins stated that a person who would be absent from work more than three times per month and required a "low stress" job would not be able to work as a secretary (Tr. 350-51).

## DISCUSSION

The main issue before the Court is the question of whether the ALJ properly weighed the many medical opinions of record. In denying benefits, the ALJ principally relied on the opinions of the two SSA consultants, especially Dr. Montorfano, who never actually examined the plaintiff. Plaintiff contends on appeal that ALJ Strauss did not explain why she accorded so much weight to the SSA consultants' medical opinions, while giving "very little weight" to the opinions of other doctors, including plaintiff's longtime treating physician, Dr. Kang. While the

11

Court's function is not to re-weigh the medical opinion evidence, Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998), where the ALJ's assessment of various doctors appears inconsistent, and her reasons for relying on certain opinion evidence lacks adequate explanation, remand is appropriate. This is especially true where, as here, the preferred opinion evidence came from non-treating, State agency consultants. See, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003).

## I. The ALJ's Decision

An applicant is "disabled" if he or she demonstrates the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A). The impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A). In evaluating disability claims, the ALJ follows a five-step, sequential analysis:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

12

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (citation omitted). The burden of persuasion rests on the claimant at steps one through four but shifts to the Commissioner at step five. Curry, 209 F.3d at 122-23 (discussing burden-shifting).

The ALJ issued her decision on May 22, 2007, after reconsidering the opinion of Dr. Kang in light of the Appeals Council remand (Tr. 12, 296). She incorporated by reference her earlier decision, dated June 20, 2005 (Tr. 283). The ALJ found, at step three of the sequential analysis, that plaintiff's impairments did not meet or medically equal a listed impairment. See 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ then determined plaintiff's RFC, finding that she could lift and carry up to 20 pounds occasionally and 10 pounds frequently, and could stand and walk for about 2 hours and sit for at least 6 hours in an 8-hour workday, with an option to sit and stand as needed, occasional stooping and crouching and no kneeling, climbing or balancing (Tr. 15, 19). See also 20 C.F.R. § 404.1545(a). In light of this determination, the ALJ found that plaintiff could perform her past relevant work as a secretary, and that she was not, therefore, disabled prior to December 31, 2004 (Tr. 19).

## II. Standard of Review

A court reviewing a decision of the Commissioner must determine whether the Commissioner's conclusions are supported by correct legal standards and are supported by substantial evidence in the record as a whole. See, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 105 (2d Cir. 2003) (quoting Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000)); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (quoting Richardson v. Perales,

402 U.S. 389, 401 (1971)). Further, the ALJ has "an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).

## III.  The ALJ's Weighing of Medical Opinion Evidence

The ALJ's consideration of the medical evidence raises two principal concerns. First, the ALJ's reasoning for preferring the State agency doctors over plaintiff's treating doctors is left essentially unexplained in her decision. Second, the ALJ too readily dismissed the opinions of Drs. Kang, Nour and Sullivan, while ignoring completely other relevant evidence of record, such as the opinion of Dr. Keith, plaintiff's pre-DLI chiropractor.

*A.  Reliance on opinions of Dr. Seo and Montorfano*

The government's brief tacitly acknowledges that the ALJ relied primarily on the opinions of Drs. Seo and Montorfano. Dr. Seo examined plaintiff twice, while Dr. Montorfano, a State medical consultant, only reviewed Ms. Scandura's record—the contents of which are unclear. The Commissioner points out that medical consultants are considered experts under applicable regulations, and their opinions constitute expert opinion evidence. 20 C.F.R. § 404.927(f); SSR 96-6p. This may be true, but the ALJ never acknowledged that the RFC finding flowing from their work differs significantly from any other assessment in plaintiff's medical history. Plaintiff, citing Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000), argues that Dr. Seo's opinion should only be entitled to limited weight in light of the fact that his conclusions are "too vague to equate with a proper RFC." (Pl.'s Br. 19.)

In short, it is at best unclear on what basis Dr. Montorfano, contrary to other doctors on record and without examining plaintiff, concluded that she could sit for 6 out of 8 hours, could

14

occasionally kneel, and could lift and carry up to 20 pounds. Given the other assessments on file, these figures seem to appear out of thin air. While Dr. Montorfano's short narratives suggest that he reviewed other medical reports, the RFC form documenting the SSA consultants' findings states "There are no conflicting medical source opinions in file." (Tr. 187.) At oral argument, the government acknowledged that this statement cannot be true, and that plaintiff presents with conditions that are capable of producing disabling pain. (See Hr'g Tr. 4:1-4; 7:9-22.) Dr. Kang's July 2004 Multiple Impairment Questionnaire assessed Scandura's limitations to be greater than the opinion of Drs. Seo and Montorfano. In other words, even if the ALJ were to discount Dr. Kang's later, more restrictive assessment of plaintiff's capabilities, Dr. Kang's *pre-DLI* report conflicts with the State consultants' later findings. This discrepancy goes unexplored in the ALJ's decision, due to her blanket determination that the entirety of Dr. Kang's medical records deserved very little weight.

*B. The ALJ's consideration of plaintiff's treating physician evidence*

The ALJ's decision cites questionable reasons for according very little weight to the opinions of Drs. Kang, Nour and Sullivan. As to Dr. Kang, plaintiff's internist who has treated her fairly regularly since 1977, the ALJ found that his response to her inquiry citing Dr. Nour's findings was "not an independent opinion." It is reasonable to assume that a general physician would occasionally rely on the opinions of specialists. To downgrade the weight given to Dr. Kang's opinions for this reason unnecessarily ignores the balance of his interaction with and evaluation of the plaintiff, which took place before the referral to Dr. Nour. Secondarily, the ALJ found Dr. Kang's RFC form "inconsistent" because he checked off "no significant limitations in doing repetitive reaching, handling, fingering or lifting," but also checked off limitations to

15

lifting in another section. (Tr. 18.) In reality, calling the two answers "inconsistent" is a stretch. One section of the form addresses repetitive actions, while the other relates to general limitations. Again, according very little weight to Dr. Kang's opinion on this basis is unreasonable. In fact, upon review of the entire record, it is hard to question, on any ground, the credibility or reliability of plaintiff's longtime internist, who had no compunction to opine unfavorably to plaintiff when the evidence required it. All of the above suggests that the ALJ failed to engage in meaningful consideration of the treating physician rule. 20 C.F.R. § 404.1527(d) (the opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir 1999). On remand, the ALJ should explain her reasons for according very little weight Dr. Kang's opinion, beyond the fact that he relied on the assessments of specialists in adjusting his own diagnosis.

As to Drs. Nour and Sullivan, the ALJ's main justification for according their medical opinions very little weight is that all examination took place after the DLI of December 31, 2004. (Tr. 18.) Both doctors first examined plaintiff less than a year after her DLI. The ALJ did not acknowledge the validity of retrospective medical opinion evidence in making her determination. See, e.g., Rose v. Barnhart, 2003 WL 1212866, at *5 (S.D.N.Y. 2003); Brown v. Apfel, 1998 WL 767140, at *4 (E.D.N.Y. 1998). Doctor Nour, in particular, reviewed earlier records and arrived at a retrospective diagnosis that the symptoms had been present since 1998. Rather than confronting this evidence, the ALJ simply questioned Dr. Nour's credibility because he formulated a retrospective opinion at the request of Binder and Binder. (Tr. 18.) This is not an adequate basis for discounting a physician's opinion. The ALJ also overstated Dr. Nour's

assessment of plaintiff's limitations, claiming that his "opinion suggests that the claimant was essentially bed-bound." (Id.) As plaintiff correctly points out, the form Dr. Nour filled out involves limits to the plaintiff's physical capabilities only in the context of a five day work week.

Finally, the ALJ's decision does not mention Dr. Keith, a chiropractor who saw plaintiff between 1998 and 2000. Chiropractors are not an "acceptable medical source" under applicable regulations, but Dr. Keith's records are consistent with a more limited profile of plaintiff's physical capabilities prior to the DLI. The absence of any mention of these findings in the ALJ's decision is indicative of a general lack of due consideration by the ALJ of both medical and non-medical evidence that seems to corroborate plaintiff's complaints of constant, chronic pain.

On balance, the ALJ applied wholly different standards when assessing the credibility of plaintiff's treating physicians versus Drs. Seo and Montorfano. She did not indicate why she credited the State medical consultants' RFC determinations with so much confidence. Even in the first hearing, ALJ Strauss relied primarily on the State RFC in formulating hypotheticals to the testifying vocational expert (Tr. 345-46). On remand, the ALJ should reconcile the inconsistencies in her weighing of the substantial medical opinion evidence of record.

## IV. The ALJ's Credibility Assessment of Plaintiff's Testimony

Credibility assessments by the ALJ are entitled to deference in light of the ALJ's ability to observe the plaintiff in person. See Snell, 177 F.3d at 135; Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999).[4] Nevertheless, it appears from the ALJ's written decision that her credibility

---

[4]Per SSR 96-7p, credibility determinations are based on the ALJ's consideration of certain factors, including:
> "(1) The individual's daily activities; (2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication the

17

determination constitutes an attempt by the ALJ to substitute her own judgment for that of Ms. Scandura's treating physicians. By requiring the plaintiff to peg her subjective complaints to objective evidence, the ALJ sets the bar too high. See, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (criticizing ALJ for seeking "objective" evidence of pain, with respect to a condition (fibromyalgia) that defied such objective determination).

The ALJ found plaintiff's statements at the hearing concerning her level of pain "not entirely credible." (Tr. 17.) This finding was based on the fact that plaintiff's pain medication seemed inconsistent with the severity of pain she described. (Id.) Specifically, the ALJ noted that plaintiff's "only pain medications . . . were aspirin and extra strength Excedrin, which she later stopped taking, and started Celebrex," and that her pain complaints were "not borne out by objective evidence." (Id.) In reaching this determination, not only did ALJ Strauss overlook several other prescribed medications, including Glucosamine, Ultram, Lidoderm, and Neurontin, but she also discounted the opinions of Drs. Nour and Kang, which supported Scandura's testimony. (Tr. 18-19.) Curiously, for example, the ALJ based her negative credibility finding with respect to plaintiff's testimony partially on the fact that she did not fully credit the treating physician opinions, but the ALJ goes on to discredit the opinion of Dr. Kang, the treating physician, because it was based on plaintiff's complaints of pain, which the ALJ did not fully credit. (Tr. 18.) In such a Catch-22 situation, the plaintiff would have virtually no *objective* way to demonstrate the veracity of her own subjective complaints. To be sure, at some point most

---

individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the individual receives or has used to relieve pain or other symptoms; and (7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."
SSR 96-7p.

18

doctors' opinions incorporate a patient's subjective complaints. See, e.g., Green-Younger, 335 F.3d at 107 ("[a] patient's report of complaints, or history, is an essential diagnostic tool") (quoting Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997)). On remand, the ALJ should reconsider her assessment of plaintiff's credibility, particularly in light of the concerns expressed in this opinion.

## CONCLUSION

For the reasons stated herein, the matter is remanded for further proceedings consistent with this opinion. The parties' motions for judgment on the pleadings are denied.

SO ORDERED.

Dated: Brooklyn, New York
       March 10, 2009

                                            s/ Judge Raymond J. Dearie
                                            _____
                                            RAYMOND J. DEARIE
                                            United States District Judge